IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:07CR 3107 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MARK D. DIX and | ) | REPORT, RECOMMENDATION |
| MARIA B. DIX, | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |


Pending before the court is the defendants' motions to suppress evidence seized as a result of a search of their vehicle on Interstate 80 near Lincoln, Nebraska on July 22, 2007. A hearing was held on the motions before the undersigned on November 13, 2007, and the matter is now ready for decision. For the reasons discussed below, I recommend that the motions be denied.


FACTS

On Sunday, July 22, 2007 Nebraska State Patrol ("NSP") Trooper David L. Frye was patrolling Interstate 80 outside Lincoln, Nebraska. He is an experienced road trooper, having served with NSP ten years.[1] He was traveling westbound at approximately 8:30 a.m. when he decided to turn around and travel westbound. As he was making his U-turn in the median of the Interstate between mile markers 402 and 403, he noticed a U-Haul truck traveling eastbound

---

[1] Frye's first two years were as a "carrier enforcement officer," but involved many of the same duties as a "trooper." NSP has now abandoned the difference in titles.

following the vehicle in front of it at what he considered to be an unsafe distance. He had a "straight-on" view of the truck for two to three seconds. He observed that as the U-Haul passed him, the driver and passenger were both staring straight ahead, which he considered to be unusual, as it is "typical" for at least the passenger to look at a stopped NSP patrol vehicle in the median of I-80. In addition, both the driver and passenger looked, in his opinion, "petrified." He thought, "Something appears very wrong with those two sitting that way and staring in that vehicle." He called fellow Trooper Chris Bigsby, who was further east, advised him the vehicle's occupants had looked "very frightened" to him, and asked Bigsby to look for the vehicle and note its occupants' demeanor as it passed him. Fry also used a stop watch and determined the time elapsed between the rear of the front vehicle and the front of the U-Haul passing the same fixed point on the highway; the time was 1.01 seconds, half the time considered safe by the standards of NSP according to the "two-second rule."[2]

Frye drove his cruiser into the roadway and caught up to the U-Haul, pulling beside it. The U-Haul slowed to 57 mph, which was unnecessary as the speed limit in that area was 65 mph. Frye saw that the driver's hands were "at 10:00 o'clock and 2:00 o'clock" on the steering wheel, and both occupants were staring straight ahead. The U-Haul and Frye passed Bigsby's location at mile marker 405 and Frye and Bigsby conferred by phone; Bigsby agreed the driver and passenger looked nervous. Frye passed the U-Haul but stayed in the left lane, watching the vehicle and its occupants in his rear-view

---

[2] Nebraska law does not adopt the "two-second rule" per se. Rather, the applicable statute requires that a vehicle follow another vehicle no closer than is "reasonable and prudent" under the circumstances. Neb. Rev. Stat. §60-6,140. The rule is recommended as a guide in the Nebraska Drivers Manual, but that does not carry the force of law.

mirrors.  At approximately mile marker 408 Frye pulled into the median, let the U-Haul pass, and pulled in behind it.  He observed the U-Haul commit another following-too-close violation,[3] and pulled it over.

Frye stopped his cruiser behind the U-Haul and approached the U-Haul on the passenger side.[4]  He advised the occupants of the reason for the stop, and requested the driver's operators license and the rental agreement for the vehicle.  He also requested that Mark Dix accompany him to the cruiser while he wrote him a warning citation for following too close.

Once in the cruiser Frye called his dispatcher to check the status of Mark Dix's operators licence, whether there were "wants or warrants" or criminal history, and the vehicle's model year, in preparation for writing the warning ticket.  Frye noticed that the rental agreement indicated that the U-Haul had been paid for with $1,700 in cash, even though there was a credit card authorization noted on the agreement; Frye considered that unusual.  He also saw that it was rented in California and was to be returned in Buffalo, New York.  As they waited for responses from dispatch, Frye engaged Mark Dix in conversation about the origin and purpose of their trip.

---

[3] The videotape of the stop began before Frye activated his lights and shows another vehicle moving into the right, "driving" lane between the U-Haul and the semi it was following.  Frye testified that ordinarily he would have stopped that vehicle for following too close, because it was obviously closer to the semi than was the U-Haul; however, by that time he had already determined he would stop the U-Haul and did not make an effort to stop the intervening vehicle.

[4] The stop was videotaped by the in-car video camera located in the center of Frye's cruiser's windshield.  Exhibit 1.

3

Dix told Frye he was moving some of his daughter's and her family's belongings to Buffalo.  He also stated that he had not packed the vehicle, but someone else had packed it, locked it, and delivered it back to him for the trip.  He didn't think he had been given the key to the lock.  He stated that he'd wanted to visit Niagra Falls, which is near Buffalo, so his wife was accompanying him on the trip, and they were going to stay a couple of days in Buffalo to do that before returning to California.  He also stated that he'd not had a traffic ticket for 24 years, and ironically, that one had also been for following too close.

During this conversation Frye noted that Mark Dix appeared extremely nervous; he was constantly rubbing his knees with his hands; his hands were shaking; he had nervous laughing--laughing at things that weren't funny; and he avoided eye contact with Frye. Frye considered his nervousness unusual, in that in Frye's experience once people he has stopped learn that they're going to be issued a warning or a citation, their nervousness usually diminishes with time.  Dix's did not.

Frye learned from his dispatcher that Mark Dix's operators license was valid and that he had no criminal history.

Frye decided to check the model year of the vehicle, and went to the U-Haul and requested the vehicle's registration from the passenger, Maria Dix.  In that process he asked her about the trip. She stated that they were helping their daughter and family move to New York, and the daughter and family were flying to New York.  In contrast to Mark Dix's comments to the trooper, Maria Dix said they were planning to fly back to California on the coming Tuesday after

4

delivering the truck to the daughter's new residence.[5]  She said she thought her husband had a key to the locked box area of the truck, and with the truck's registration she also gave Frye a traffic ticket issued to Mark Dix only a couple of days earlier in Utah.  Frye could not verify the model year of the U-Haul, and requested his dispatcher to confirm it.

   Frye had conversed with Bigsby earlier, and Bigsby had asked if Frye needed any assistance with the stop.  Although Frye stated he did not need any assistance, he accepted Bigsby's offer.  Bigsby arrived at the scene at some point early in the progression of the stop.

   Frye returned to the cruiser and continued to converse with Mark Dix.  Mark Dix was very talkative, which to Frye was suspect behavior, as though Dix was trying to divert Frye's attention to irrelevant matters.  Frye completed the warning citation and returned to Mark Dix his papers and the warning citation.  He had to interrupt Dix to tell him that the traffic stop was over.

   Dix opened the cruiser's door to exit, at which time Frye asked Dix if he would mind talking with him further.  Dix agreed, and got back in the patrol car.  Frye advised that in his experience people sometimes load U-Haul trucks in such a fashion that during the trip the load might shift, causing a safety risk.  He asked Dix if he would let Frye take a look into the back of the truck.  Dix said that would be okay, but he didn't think he had a key to the lock.  Dix went to the cab of the truck to check with

---

[5] As noted above, July 22 was a Sunday, and Lincoln, Nebraska is more than 1,000 miles from Buffalo, New York. "MapQuest" estimates the minimum driving time between the two cities to be over 16 hours.  (www.mapquest.com  visited November 26, 2007).

5

his wife, as Frye followed.  Frye heard Maria Dix say, "I thought you had the key," and Mark Dix replied, "No, I don't."  Mark Dix then advised Frye that they did not have a key to the padlock securing the back door of the U-Haul.  Frye asked, "Then how will you open the load when you get there?"  Mark Dix replied that their daughter was already in Buffalo and would come and unlock it.  Frye advised Dix that he had bolt cutters in his patrol vehicle and also keyed and unkeyed locks to replace the lock on the U-Haul if it were cut off.

By this time, another trooper, Richard D. Fellin, accompanied by his drug dog "Dekon," had arrived on the scene to assist if necessary.  Fellin had previously that morning advised Frye that he was in the area[6] and he subsequently heard the radio conversation in which Frye requested a criminal history check on the driver, Mark Dix.

Frye went to his patrol car and retrieved bolt cutters and a substitute lock to use as a replacement lock for the U-Haul.  He showed them to Mark Dix.  He requested that Dix cut the lock on the truck.  When Dix seemed hesitant, Frye conversed with Dix about his suspicions that the truck was being used to haul contraband.  He stated that allowing Frye to look into the truck was an opportunity to dispel those suspicions.  He asked Dix to put himself in Frye's position as a police officer "with a badge and a gun," and asked Dix about the suspicions his answers had aroused.  Dix acknowledged the statements might be seen as suspicious.  Dix agreed to cut the lock.

---

[6] Because of a limited number of canine teams available at any given time, it was standard practice for NSP canine handlers to advise other troopers of their presence in any area so that in the event they were needed, they could promptly respond to a call for assistance.

Dix appeared to try to do so, unsuccessfully. Then Frye tried to cut the lock, again without success. Finally, Trooper Fellin stepped in and succeeded in cutting the lock. Frye asked Mark Dix to open the rear door, and Dix did so.

Once the back door was lifted, Frye immediately recognized what he considered, from training and experience, to be a "junk cover load" of furniture, that is, a load consisting of throw-away, worthless old furniture loaded into the back of the truck to make it appear that a move was taking place, when in reality, it was only a "cover" for the transportation of illegal drugs or other contraband. See Exhibits 6-10.

Frye requested that Dix converse with him in his patrol vehicle. Dix agreed to do so. In the cruiser Frye advised Dix that based on his answers to Frye's questions, Maria Dix's answers to the same questions, and his training and experience, he was "confident" there were illegal drugs in the vehicle. He requested again that Dix consent to the search of the back of the truck. Dix declined.

At that point Frye exited the patrol vehicle and requested Trooper Fellin to "run the dog" around the U-Haul. Frye had Maria Dix exit the U-Haul and sit in the rear seat area of the patrol vehicle, which she did. The rear door to the U-Haul was closed.

"Dekon" is a Belgian Shepherd that was at the time of this search about 3 ½ years old. He had been teamed with Trooper Fellin for approximately six months. The two were trained as a team first in October, 2006 by Sgt. Andrew J. "Buck" Duis of NSP, a certified trainer. First was a "patrol phase" of training, in which the dog is trained how to track people; apprehend people; to release a

person when commanded; to search buildings; and perform various agility tests.  "Dekon" and Trooper Fellin passed a two-day evaluation test and on October 10, 2006 received an NSP certification as a "Patrol Dog Team" and also a like title from the International Congress of Police Dog Standards.  Exhibit 2.  The latter is an organization which employs West German standards in training police dog teams.  Both Duis and Cpt. Mike Kerby, the Director of Training for NSP, are certified instructors for the International Congress.

Fellin and "Dekon" next entered training for narcotics detection.  That training, also conducted by NSP personnel, consists of a minimum five-week course in which the dog was taught how to recognize the odors of marijuana, heroin, cocaine, and methamphetamine; communicate that he has smelled a recognized odor (Dekon is a "passive" indicator, meaning that when he has located the strongest source of the recognized odor, he sits and stares); to distinguish recognized drug odors from other smells; and to search for recognized odors in street searches, room searches, and person searches, both on and off leash.  At the end of that training and after a one-day evaluation test, on February 8, 2007 Fellin and "Dekon" were certified as a "Narcotics Detector Dog Team" by the NSP, and again also received a like title from the International Congress.  Exhibit 3.

Once a dog team is certified, NSP requires "maintenance training."  The team is directed to spend at least one day per week on training activities, and Fellin and "Dekon" train at least the equivalent of one full day each week, though not always on just one specific full day.  NSP also requires a team to be tested and re-

8

certified annually.  At the time of this traffic stop, Fellin and "Dekon" had not yet been working together for one year.[7]

NSP requires that records be kept of each narcotics detection dog team's deployments, both in training situations as well as actual deployments conducted "in the field."  The NSP records of Fellin and "Dekon's" were ordered produced to defense counsel prior to the hearing on these motions.  See Filing 33.  While many such records were produced, only a few were addressed in the evidence.  In general, the team was successful most of the time in discovering drugs when NSP personnel either knew or had suspicions that drugs were present.  There were, however, instances in "field" deployments when "Dekon" indicated the presence of the odor of drugs and no drugs were found; rather than characterize these as "false positives," the NSP considers these instances inconclusive, because even though drugs might not have been present at the time of the search, drugs might have been present at an earlier time, in which case the scent could have lingered, causing the dog to indicate.  Fellin testified that "Dekon" has never refused to comply with a command to search, and he has never stopped searching without being commanded to stop.  "Dekon" had had, at the time of the hearing, over 1100 searches, including both training and actual deployments "in the field."

Fellin took his dog around the truck clockwise, beginning at the front license plate.  He testified that "Dekon" "indicated" to the odor of narcotics first between the cab and truck box on the driver's side; again at the driver's side rear of the vehicle; and a third time at the passenger's side rear of the truck.  The videotape clearly shows "Dekon" indicating at the right rear

---

[7] They did achieve re-certification in October, 2007. Exhibit 5.

portion of the truck box when he sits and stares at the lower right portion of the rear panel.  Fellin put his dog back into his truck.  He then advised Mark Dix that the dog had indicated the odor of narcotics, and the truck would be searched.  The truck was searched, and the officers found the marijuana which forms the basis of the charges in this case.[8]

## POSITIONS

Defendants argue that there was insufficient evidence to support a stop of the defendants' vehicle; expansion of the stop to undertake a drug investigation was without reasonable suspicion and was too lengthy; the consent given by Mark Dix to search the truck was not voluntary; the drug dog did not "objectively indicate" to the odor or drugs, and the dog was not sufficiently competent or adequately trained.

The government counters that the stop was supported by probable cause; the expansion of the stop was justified; the consent was voluntary; and the dog was a "well-trained narcotics detection dog"[9] that was "reliable,"[10] and his indication was apparent on the videotape.

---

[8] The marijuana was found in vacuum-sealed packages which had been placed inside other packages containing mustard, pepper, and dryer sheets.  These outer packages were also vacuum sealed, and then placed inside two closed food freezers in the back of the truck.

[9] United States v. Place, 462 U.S. 696, 707 (1983).

[10] United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999).

DISCUSSION

1. <u>The Stop</u>

Defendants acknowledge that the law is well settled that a traffic violation, however minor, provides probable cause to stop a vehicle traveling on a roadway. <u>United States v. Esquivel</u>, ___ F.3d ___, 2007 WL 4072793 (8th Cir. November 19, 2007), citing <u>United States v. Ehrmann</u>, 421 F.3d 774, 780 (8th Cir. 2005), <u>cert</u>. <u>denied</u>, 546 U.S. 1122 (2006). In this case Trooper Frye saw the U-Haul following the vehicle in front of it at a distance he considered not "reasonable and prudent" as required by Nebraska law. He used his stop watch to verify that the following distance was roughly half that necessary to comply with the "two second rule."

> While the so-called "two-second rule" is not enshrined in Nebraska law, it is a widely-used rule of thumb that accounts for the speed of traffic in a more reliable way than does a distance-based heuristic. Other circuits that have considered the propriety of police stops predicated on the two-second rule have generally agreed. <u>See</u> <u>United States v. Muriel</u>, 418 F.3d 720, 724 (7th Cir. 2005); <u>United States v. Nichols</u>, 374 F.3d 959, 965 (10th Cir. 2004), <u>vacated</u>, 543 U.S. 1113 (2005), opinion affirming conviction reinstated and case remanded for resentencing, 410 F.3d 1186, 1187 (10th Cir. 2005). We think that when one car trails another by less than two seconds, an officer will generally have probable cause to believe that the trailing car is closer than what is reasonable and prudent.

<u>United States v. Andrews</u>, 454 F.3d 919, 921-22 (8th Cir. 2006). Frye's actions in stopping the U-Haul were objectively reasonable. <u>See</u> <u>United States v. Bueno</u>, 443 F.3d 1017, 1024-25 (8th Cir. 2006) (neither mistake of law or fact render traffic stop illegal as long

11

as actions of officer were objectively reasonable under the circumstances).

2. <u>Expansion of the Stop</u>

Defendants argue that Frye's questioning of Mark Dix went beyond that permitted in a traffic stop, and the information he obtained did not amount to a reasonable suspicion of criminal activity sufficient to justify his expansion of the stop. I disagree.

When a law enforcement officer makes a routine traffic stop, the officer may conduct an investigation reasonably related in scope to the circumstances that prompted the stop, and may detain a motorist while the officer completes the routine tasks of writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history. <u>United States v. $404,905.00 in United States Currency</u>, 182 F.3d 643, 647 (8th Cir. 1999).[11]  An officer may hold a motorist longer only if s/he has "a reasonable articulable suspicion for believing that criminal activity [is] afoot." <u>United States v. Beck</u>, 140 F.3d 1129, 1134 (8th Cir. 1998).

> In determining whether [a trooper] had reasonable suspicion, [the court] must consider the totality of the circumstances in light of [the trooper's] experience. See <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002);

---

[11] Trooper Frye engaged Mark and Maria Dix in much extraneous conversation, inquiring into the names and ages of their grandchildren, for example. It is questionable whether this was simply "casual" conversation. It was most certainly not related to the purposes of the traffic stop or within permissible areas of inquiry. I do not rely on any of the Dixes' answers to such questions in reaching my conclusions on "reasonable articulable suspicion."

12

>United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004). "Although each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, 'a combination of factors may warrant further investigation when viewed together.'" Fuse, 391 F.3d at 929 (quoting United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002)).

United States v. Lyons, 486 F.3d 367, 372 (8th Cir. 2007).

By the end of the traffic portion of the stop when Frye returned the paperwork to Mark Dix, only 24 minutes had elapsed from the moment Frye first approached the U-Haul. In that time Frye had learned:

- The truck had been rented for $1,700 cash.
- Even though it had been rented for a cash payment, there was a credit card authorization shown on the rental agreement.
- The truck had been packed by someone else, not the occupants.
- The truck had been packed outside of the presence of the occupants, and the occupants did not know for certain what was inside the truck nor how safely it had been packed.
- The driver of the truck stated he didn't think he had a key to the lock securing the truck box.
- When the truck had passed Frye on the highway, both times both occupants had stared straight ahead and had looked very nervous.
- The driver of the truck, Mark Dix, was extremely nervous when he was sitting in Frye's patrol vehicle, shown by avoiding eye contact, constantly rubbing his knees, shaking hands, nervous laughter, and extraordinary talkativeness, and that nervousness did not subside as

>    the stop progressed, even after Frye advised him that he would receive only a warning.
> - The truck's occupants' stories about their trip were inconsistent, in that:
>   - Mark Dix told Frye they were planning to spend a couple of days in Buffalo to see Niagra Falls, while Maria Dix told him they planned to fly back to California only two days hence;
>   - Maria Dix told Frye their daughter and her family were flying to Buffalo, while Mark Dix told him they were driving there or were already there;
>   - Mark Dix told Frye he had not received any traffic tickets for 24 years, but Maria Dix gave Frye a ticket Mark Dix had been issued only two days before in Utah;

All of these facts came to light during the traffic portion of the stop, and in response to Frye's legitimate questions about the vehicle, the occupants, and the origin and purpose of the trip. These circumstances constituted reasonable suspicion for Frye to believe that criminal activity may be afoot, and to expand his investigation. Therefore, at the point when he returned documents and asked Mark Dix to answer additional questions, Frye could have detained Dix to conduct further inquiry and investigation, even if Dix had not consented to further conversation.

3.  Consensual Encounter

However, Mark Dix did consent to further discussion with Trooper Frye. He got back into the patrol vehicle and shut the door. He answered more questions. There is no evidence that his doing so was anything other than consensual. No promises, threats,

or pressure of any kind were applied to cause him to get back into the car and converse further.  His consent was voluntary.

Even so, Trooper Frye used a ruse to try to get Mark Dix to consent to Frye looking into the back of the truck.  He offered that in his experience loads shift on the highway, and in the plains states with the high winds, such shifting could pose a threat of vehicle rollover.  In fact, Trooper Frye was not at all concerned with the possibility that this load had shifted; he merely wanted to look into the back of the truck to see what was there, because he suspected narcotics were being transported.  Did this so mislead Mark Dix that Dix's consent can no longer be considered consensual?

I think not, for three reasons.  First, the subjective intentions of an officer are largely irrelevant, so long as reasonable suspicion exists to conduct an investigation, as it did here.  See, e.g. Whren v. United States, 517 U.S. 806, 813 (1996) (Officer's subjective intentions for traffic stop play "no role in ordinary, probable-cause Fourth Amendment analysis").  Second, Dix had already re-entered the patrol vehicle before Dix mentioned anything about the possibility of a load shift.  Third, there is no evidence that, absent Trooper Frye's feigned concerns, Dix would not have consented to further conversation.  Had Dix wanted to, he could have discontinued the conversation by simply saying "nonsense" and terminating it.  He did not do so.  While use of the ruse was one circumstance, I conclude from the totality of the circumstances that Dix's re-entering the patrol vehicle and engaging in additional conversation with Trooper Frye after the

15

conclusion of the traffic portion of the stop was a consensual encounter.[12]

4. Consent to Open the Truck.

> A defendant's voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). A court determines whether consent is voluntary under the totality of the circumstances. United States v. Gipp, 147 F.3d 680, 685 (8th Cir. 1998). The Government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual. United States v. Cedano-Medina, 366 F.3d 682, 684-85 (8th Cir. 2004). In evaluating the reasonableness of the officer's belief, we consider the characteristics of the person consenting, "including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects." United States v. Almendares, 397 F.3d 653, 660 (8th Cir. 2005). We also consider the environment in which the alleged consent took place, "specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently . . . as the search occurred." United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001).

United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005).

---

[12] Had Dix terminated the conversation, Trooper Frye would have been justified in further detaining both defendants on the basis of his reasonable articulable suspicion, as discussed above, that criminal activity may be afoot.

There is no evidence concerning defendant's education, but from the videotape, he appeared to be of normal intelligence. He did not appear to be impaired in any way. He had no past criminal history, so he cannot be said to be familiar with his rights in the criminal justice system. He was not told he could withhold consent. At the time he gave his consent to open the truck's rear door, he had been stopped for approximately 34 minutes. There were never any threats communicated to him and no evidence of any "punishment" when he appeared hesitant or to have even withdrawn his consent. The atmosphere, however, was intimidating with three NSP vehicles and three officers present, a dog in the back of one of the vehicles, lights flashing, and Trooper Frye's use of an elevated, argumentative tone of voice in addressing Mark Dix when he became hesitant about opening the truck box. No promises were made to him in return for his consent to open the truck box. As discussed above, however, Trooper Frye did "misrepresent" his concerns about load shifting.[13] The consent occurred on a public roadway, not in a secluded area. Finally, Mark Dix assisted in cutting the lock and actually opened the truck's rear door himself, albeit at Frye's request. Considering the totality of the circumstances, Dix's consent to open the truck box was in fact voluntarily given, and a reasonable officer in Frye's position

---

[13] Separately addressing Frye's ruse in connection with Dix's consent to open the truck, just as with the consent to talk further with Trooper Frye, there is no evidentiary basis to conclude that the ruse played a determining role in obtaining Dix's consent to open the truck, either. As events unfolded, although he initially seemed to consent to opening the back of the truck, he was hesitant, and he even at one point appeared to withdraw his consent. As Dix vacillated on his consent to open the back of the truck, ultimately it was Frye's confronting Dix with the fact that he believed Dix was transporting illegal contraband and recounting the reasons for his suspicions that led to Dix's consent to open the truck, not any concerns, true or not, having to do with shifting of the load.

would so conclude. The Fourth Amendment was not violated by the opening of the truck box.

Even if the consent to open the truck box could somehow be characterized as involuntary, which it was not, it is clear that the dog sniff provided probable cause to search the truck. As discussed above, "Dekon" was a "well-trained drug detection dog" and there is no evidence that he was anything but reliable, and known to be reliable at the time of the sniff. United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007) (citing United States v. Sundby, supra. ("Our cases establish that [a] dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable").[14]

Accordingly,

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B) that the defendants' motions, filings 24 and 26, be denied in all respects.

The parties are notified that failure to object to this recommendation as provided in the local rules may result in a waiver of the right to appeal the district judge's adoption of findings in the recommendation.

FURTHER, IT HEREBY IS ORDERED, Trial of this matter is set to commence at 9:00 a.m. on January 22, 2008 before the Hon. Richard G. Kopf in Courtroom #1, Robert V. Denney United States Courthouse and Federal Building, Lincoln, Nebraska. Trial is scheduled for a duration of three trial days. This trial setting is subject to the

---

[14] Arguably, once the truck box was opened and the troopers recognized the "cover" load, that recognition, even without the dog sniff, provided a "fair probability" under all the facts to believe that evidence of a crime would be found in the truck. Illinois v. Gates, 462 U.S. 213, 238-39 (1983). Because of the facts of this case, the court need not address that potential issue.

prior disposition or continuance of <u>United States v. Miller</u>, 4:05CR3091 and <u>United States v. Robison</u>, 4:07CR3127.

     Dated November 29, 2007

                        BY THE COURT

                        s/ *David L. Piester*
                        United States Magistrate Judge